SO ORDERED.

SIGNED this 24th day of February, 2020.



_____
Robert E. Nugent
United States Bankruptcy Judge

_____

PUBLISHED

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF KANSAS

IN RE:

**SOMPHIEN AMPHONE**

                **Debtor.**

**Case No. 18-10544**
**Chapter 7**

IN RE:

**ILENE J. LASHINSKY,**
**United States Trustee**

                **Plaintiff,**
**vs.**

**SOMPHIEN AMPHONE,**

                **Defendant.**

**Adv. No. 18-5083**

## <u>MEMORANDUM OPINION</u>

1

Courts freely grant chapter 7 discharges unless the debtor has failed to preserve or destroyed books, records, and papers from which their financial condition can be ascertained under § 727(a)(3)[1] or has failed to satisfactorily explain the loss of their assets under § 727(a)(5).[2] But, courts strictly interpret these and other § 727(a) objections to discharge before imposing bankruptcy's "death penalty" on a debtor.[3] This debtor is a compulsive (and unsuccessful) gambler, but not a professional one. She is a home health care business-owner, registered nurse, wife, and mother of four children who made numerous, successive trips to casinos over the three-year period 2015-2017 and lost millions of dollars. She kept no real-time won and loss records and, only after filing chapter 7 in the spring of 2018 and the United States Trustee's (UST) commencement of this adversary proceeding, did she obtain casino internal records reflecting some of her gains and losses. She also provided some bank account statements reflecting deposits of gambling winnings and withdrawals to fund gambling activity or pay down markers. While her records might not withstand a tax audit, how she kept records was "justified under all the circumstances of the case" and therefore not a reason to deny her a discharge under § 727(a)(3). Because debtor has "satisfactorily" explained her losses to the Court, the UST's § 727(a)(5) objection to her receiving a discharge should be overruled.[4]

---

[1] 11 U.S.C. § 727(a)(3). All statutory references are to the Bankruptcy Code, Title 11 U.S.C. unless otherwise indicated.

[2] 11 U.S.C. § 727(a)(5).

[3] *In re Leone,* 463 B.R. 229, 248 (Bankr. N.D. N.Y. 2011) (describing a denial of discharge as the "death penalty of bankruptcy"); *In re Wells,* 426 B.R. 579, 611 (Bankr. N.D. Tex. 2006) (declining to impose the "death penalty in bankruptcy").

[4] A two-day trial was held on the UST's complaint. Ilene J. Lashinsky, United States Trustee, appeared by Christopher T. Borniger and Jordan M. Sickman. Defendant Somphien Amphone appeared in person and by her counsel David Eron and January Bailey.

2

Facts

*Background*

Debtor Somphien Amphone ("Amphone") is a registered nurse who holds a bachelor's degree in nursing from Wichita State University. In 2006, she founded Healing Hands Health Care, LLC and owns 50% of its equity. Healing Hands is a Medicaid-certified home nursing provider and 90% of its patient base are Medicaid patients,  It operates in a building Amphone owns.  The company has a payroll of $45,000 per month and grossed over a million dollars in each of the two years prior to her bankruptcy. She previously owned and operated a similar agency in Florida, but shut it down in 2004 after her first husband became ill with leukemia. Amphone's administrator role at Healing Hands doesn't involve finance beyond her preparing the Medicaid billing, reviewing payroll, paying bills, and signing the company's tax return. The other 50% owner served as the Director of Nursing until her resignation in March of 2019. No contention is made that Amphone co-mingled her individual finances with Healing Hands or used the business revenue to fund her gambling activity.

Amphone lives with her current husband Dr. Alex Suh, her father Kay, her mother, and her four children (three from her first marriage).[5] Dr. Suh is a practicing chiropractor. Amphone and her husband maintained separate financial accounts. He accompanied Amphone on most gambling trips but never gambled or

---

[5] Based on the 2015-2017 tax returns, two of the four children were under age 17  throughout this period. The children will be referred to as "PH", "PA", "DA" and "KA" in this opinion.

went on the floor and didn't know the extent of her gambling winnings or losses or her liability for markers.

*Gambling History*

Amphone says that while her first husband was in a Houston hospital, she diverted herself by visiting a nearby casino where she first acquired a taste for gambling that ripened into a compulsion. After he died in 2009, her gambling increased to an almost daily habit. Her compulsion consumed not only most of her children's money, but much of her own, causing her to dip into her savings account, borrow from friends and family, and to default on debts to casinos in Las Vegas, Kansas City, Baltimore, and other places. By 2016, her situation was out of control and by 2018, she was here—filing bankruptcy on March 30, 2018.

Prior to filing and faced with mounting losses and collection threats, she retained Samini Scheinberg L.C., a law firm in Newport Beach, California, on a fellow gambler's recommendation. If markers were presented and dishonored, she feared felony charges in Nevada that would lead to the loss of her nursing license and Medicaid certification for her Healing Hands business. She paid the Samini firm a $110,000 retainer on November 14, 2017 and another $55,000 on December 20, 2017[6] Her relationship and transactions with the Samini firm were disclosed in her initial Statement of Financial Affairs (SFA).[7] On December 4, 2019 Amphone amended her SFA to disclose an additional $10,000 payment to the Samini firm in

---

[6] Ex. 9, pp. UST372, UST374.
[7] Ex. 2, p. 48.

4

October of 2017.[8] At trial, Amphone could not clearly articulate what legal services she believed the law firm provided to her. The chapter 7 trustee filed an adversary proceeding to recover those funds either as state or federal law fraudulent transfers.[9] The trustee recently settled that proceeding for $140,000.[10]

Amphone's gambling activity came to a head in October of 2017 while she was on a Las Vegas gambling trip to Caesar's Palace accompanied by her husband and children. By then she owed over $600,000 on markers between Caesar's in Las Vegas and Harrah's in Kansas City (also a Caesar's property) and she was trying to obtain loans to pay off the markers. Dr. Suh gave her an ultimatum to choose between gambling or her family and return home. Amphone chose to stay and gamble and her family left. By the next day, Amphone regretted her choice and returned home. Before leaving, she signed a self-exclusion document, signing herself out from all Caesar's properties. Upon returning home, Amphone began treatment for her gambling addiction.

Amphone offered the testimony of her "gambling counsellor" to establish that she is a compulsive or addicted gambler. Joan Briles-Kline holds a Master's degree in Clinical Social Work and has some bachelor's study in the area of family systems and life provisions. In 2002 Dr. Briles-Kline obtained the Kansas certification "Gambling Counsellor Level II" and testified that she had attended numerous

---

[8] Doc. 114.
[9] *Williamson v. Samini Scheinberg, P.C., (In re Amphone)*, Adv. No. 19-5035 (Bankr. D. Kan.) (The successor Chapter 7 trustee, Darcy Williamson, was substituted as the plaintiff for former trustee Edward J. Nazar).
[10] Doc. 123.

**5**

educational seminars about compulsive gambling. She began treating Amphone in October of 2017. Dr. Briles-Kline wasn't disclosed as an expert witness during discovery, and she didn't submit an expert report, but analogizing to a "treating physician," a court could allow and admit her testimony concerning her treatment and evaluation of Amphone, including her diagnosis and opinions incidental to that treatment.[11] The Court admits and considers Dr. Briles-Kline's testimony to this extent. She testified that she had treated Amphone on a regular basis for at least a year. Dr. Briles-Kline testified that Amphone met all nine diagnostic criteria for severe gambling disorder found in the DSM-5.[12] The presence of any four of these criteria in a person within a twelve-month period suggests an addiction—Dr. Briles-

---

[11] *See Wreath v. United States,* 161 F.R.D. 448 (D. Kan. 1995) (treating physician may testify as to the care and treatment of the patient and so long as treating physician's opinion testimony is based upon facts made known during the course of treatment of patient, physician is not a specially retained expert witness subject to Fed. R. Civ. P. 26(a)(2)(B)); *Kennedy v. United States,* 2008 WL 717851, at *2 (D. Kan. Mar. 17, 2008) (a physician is an ordinary fact witness when she testifies on information and opinions developed and drawn during the treatment of the party as a patient). *See also* Advisory Committee's notes to Fed. R. Civ. P. 26 regarding 1970 Amendment (formerly subdivision (b)(4) and discovery from experts, stating that it does not apply to experts who acquired information because he was an actor or viewer with respect to transactions or occurrences that are part of the subject matter of the lawsuit. Such experts [treating physicians] are treated as ordinary fact witnesses if the testimony concerns information, conclusions and opinions which were obtained in the course of treating the party).

[12] American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (5th ed. 2013 Am. Psychiatric Ass'n). The nine (9) criteria include:

- Needing to gamble with more money to get the same excitement from gambling as before;
- Feels restless or irritable when trying to reduce or stop gambling;
- Keeps trying to reduce or stop gambling without success;
- Is preoccupied with gambling -- both reliving past gambling experiences and planning future gambling events;.
- Gambles when feeling depressed, guilty or anxious;.
- Tries to win back gambling losses;
- Lies to cover up how much they are gambling;
- Loses not only money, but also relationships, their job, or a significant career opportunity as a result of gambling;
- Becomes dependent on other people to give them money to deal with financial problems that have been caused by gambling.

**6**

Kline identified all nine in Amphone. That Amphone is a compulsive gambler is shown by the frequency of her successive gambling trips, her betting volume, and the trouble casinos took to get her to their properties.

Much of this trial was devoted to detailing Amphone's numerous gambling trips, many underwritten by casinos who provided her with travel expenses, food, lodging, and entertainment. Amphone was a sought-after player because of her propensity to gamble and win (but more often lose) hundreds of thousands of dollars at a time. That made her a profitable "mark" for the casinos. They encouraged her with complimentary ("comped") airfare, expensive hotel rooms, World Series, NCAA Basketball Tournament, and NBA Finals tickets, and other blandishments. Amphone financed her play mostly with casino credit—markers—and her and her family's money (including the custodial money she held for her children). By the time she filed this case nearly $4.0 million, generated by Amphone's playing the mini-baccarat table game, had flowed through her bank accounts.[13] At several properties, she had her own private table and could select her preferred dealer. She was permitted to bet as much as $15,000 a hand. She was well known at the casinos and didn't have to show her player's card to "clock-in" and use it.[14]

---

[13] Mini-baccarat or "minibac" uses 6 decks of cards and is a miniature version of baccarat, a card game dealt to the players by the "banker" from a "shoe" that contains 8 decks of cards. Players and the banker are each dealt two cards that must total as close to 9 as possible (if the cards' face total exceeds 10, the first digit is dropped, i.e. a 6 and 7 is 3 in baccarat). Players bet on themselves or on the banker. In mini-baccarat, the banker deals each hand from the shoe while in true baccarat, the banker passes the deal around the table. https://www.vegas.com/gaming/gaming-tips/baccarat/.

[14] *See Adamar of New Jersey, Inc. v. August (In re August)*, 448 B.R. 331, 337-38 (Bankr. E.D. Pa. 2011) (explaining that the purpose of a player's card is to track the gambler's betting history and that casinos "comp" a gambler based upon the tracked information).

Beginning in January of 2015, Amphone took multi-day visits to the Harrah's properties in Kansas City, Lake Tahoe, Council Bluffs, and Rincon-San Diego; the Ameristar properties in Kansas City and St. Charles; Atlantis and Baha Mar in the Bahamas; the Horseshoe-Baltimore and Maryland Live in Maryland; Caesar's Palace and Treasure Island in Las Vegas; and the Seminole Tribe in Oklahoma.[15] Many of these visits were made in rapid succession. Using Exhibit L, here are some examples. She spent 16 days at Harrah's North Kansas City between May 2 and July 17, 2015. Beginning December 4, 2015, she started at Caesar's-Las Vegas, went to Treasure Island the next day, then to the Kansas City Harrah's on December 8. The most telling example of her compulsion begins on June 2, 2017 at the Ameristar in Kansas City and concluding there on August 21, between which she traveled to the Bahamas (Baha Mar) once and to Las Vegas *twice* in under two months. Her final pre-petition binge started in Baltimore on September 3, 2017 and ended on October 14, including visits to the Horseshoe and Maryland Live in Baltimore, Caesar's Las Vegas (two separate trips), Treasure Island Las Vegas, and Kansas City, within less than six weeks. If Amphone was not hopelessly addicted to gambling between January of 2015 and October of 2017, she was deeply immersed in it. She gambled on more than 300 days over 34 months. Even after she "stopped" in 2017, she relapsed and resumed gambling in Kansas in late 2018 or early 2019 and continued to do so during the administration of this case.

---

[15] Prior to 2015, Amphone signed a self-exclusion document to prevent her from gambling at the nearby Kansas Star casino and Native Lights casino in Oklahoma, the two casinos that she frequented and were within driving distance.

8

*Bank Records*

Amphone maintained joint bank accounts with at least two of her sons. After her first husband died, she opened custodial accounts at Emprise Bank for monthly deposit of social security survivor's benefits payable to her sons as her late husband's minor dependents. No records of these Emprise custodial accounts were introduced at trial. On April 1, 2017 the sum of $108,363, representing her first husband's survivor benefit, was transferred to a Meritrust Credit Union joint account with PH.[16] Later that month, Amphone withdrew $100,000 and $8,000 and deposited it into her personal Meritrust account for gambling.[17] She had a similar account with her son DA at Credit Union of America (CUA) that was also funded with what remained from her husband's survivor benefit in the Emprise custodial account when it was closed. Amphone admitted to taking all of DA's survivor benefit for gambling—some $130,000 or $140,000. No bank records from the CUA account were offered at trial.

Amphone maintained her own individual accounts at Wells Fargo Bank,[18] Skyward Credit Union,[19] Meritrust Credit Union,[20] and, before filing, had closed a personal savings account at Emprise Bank. No account statements for this Emprise

---

[16] Ex. 10, a Meritrust account with her son PH, consisting of account statements for the period January 2017 to March 2018. *See* p. UST390 for April 1 deposit of the $108,363.

[17] Ex. 10, p. UST390 and Ex. 9, pp. UST356-357.

[18] Ex. 7 consisting of checking account statements for the period December 2016 to April 2018. Amphone testified that she opened the Wells Fargo account for Caesar's casinos deposits, because the funds are immediately available.

[19] Ex. 8 consisting of account statements for the period January 2017 to March 2018. Amphone says the Skyward account was her "primary" account and it was used for household/personal expenses and some Ameristar casino or gambling transactions.

[20] Ex. 9 consisting of account statements for the period January 2017 to March 2018. This Meritrust account includes casino transactions for Harrah's North Kansas City.

9

account were ever produced or offered at trial, and the closed account was not disclosed on Amphone's Statement of Financial Affairs (SFA) until her second amended SFA was filed on June 3, 2019.[21]  Amphone stated that because the Emprise account had been closed by September of 2017, she no longer had online access to the account and could not print account statements for it. Her Wells Fargo account statements though, show a wire transfer of $130,000 from the Emprise account on July 26, 2017 shortly before its closing.[22]  Amphone spent those funds for gambling. Another $70,000 was wired from the Emprise account to her Meritrust account on August 16, 2017.[23] Amphone conceded that some $4,000,000 was deposited in her accounts over the 15-month period represented by the bank account statements (January 2017-March 2018) and leading up to her bankruptcy filing on March 30, 2018.

Amphone didn't receive paper bank account statements for any of her accounts. What she presented to the trustee and at trial were images of statements viewable online that she printed after this case was filed. She rarely, if ever, reconciled her accounts. Instead, she checked them online, mostly to assure herself that incoming items would be covered and not dishonored. She produced no copies of cancelled checks from those accounts, and claimed that they were not available online. Because the Caesar's properties all have Wells Fargo branches or ATMs at

---

[21] *See* Ex. 2, p. UST65, Question 20 (initial SFA); Ex. 3, p. UST86, Question 20 (amended SFA); Ex. 4, p. UST 235, Question 20 (amended SFA finally disclosing the Emprise Bank account was closed in "Aug/Sept 2017")
[22] *See* Ex. 7, p. UST272.
[23] *See* Ex. 9, p. UST366.

**10**

their properties, she kept a Wells Fargo checking account for her winnings (and withdrawals) at Caesar's Palace, and Harrah's in Kansas City, among others. She likewise kept a similar account at Skyward Credit Union for her gambling at Ameristar properties. She supplied these bank account statements and those from Meritrust Credit Union to the UST and her case trustee during case administration and offered them at trial.[24]

*Markers*

Wherever she gambled, Amphone established a casino line of credit. That allowed her to borrow from the casino to draw chips or cover her losses by signing "markers." It also allowed her to avoid carrying large amounts of cash. Though the evidence about this was paltry, I understand the process to work this way. A typical prospective gambler establishes a line of credit by demonstrating she has deposited funds sufficient to liquidate the line's limit should the gambler lose. The gambler signs a marker to draw on the line of credit, essentially an IOU, to buy chips to gamble. The marker promises payment (with no interest) immediately and, in most locales, no later than thirty (30) days from issuance. When or if she loses and cannot cover her losses from funds on hand, and if the gambler fails to pay in 30 days, the marker is presented to the debtor's bank as a check would be. If one's marker bounces, Nevada law treats that like an insufficient funds check—a crime, usually a felony—and a criminal prosecution ensues.[25] Because bad check crimes are a

---

[24] *See* Ex. 7-9.
[25] *See Mandalay Resort Group v. Miller (In re Miller),* 310 B.R. 185, 189, 191 (Bankr. C.D. Cal. 2004) (describing marker process and stating that markers are "a type of check" drawn on the customer's designated bank account); *In re August,* 448 B.R. 331, 338-39 (Bankr. E.D. Pa. 2011) (describing

species of fraud, being convicted of bouncing a marker may have serious consequences for someone with professional licenses like Amphone.

According to Amphone, when she signed a marker, she would receive a receipt. Because Dr. Suh disapproved of her gambling, she concealed and shredded those receipts to prevent him from finding them. She also justified shredding the receipts because she knew the casinos maintained those records and she could obtain them if she ever needed them. Dr. Suh testified that he knew about Amphone's gambling because he accompanied her on many trips, but did not participate or go on "the floor." He also testified that he did not believe Amphone maintained or destroyed any records of her gambling—of course, he may not have known about the receipts. None were presented at trial. Records of markers were among the documents Amphone obtained from the casinos after this proceeding was commenced.

*Exhibit L and Casino Records*

The scope of Amphone's gambling over the three years prior to filing bankruptcy was presented at trial through Exhibit L—the chronological summary of her gambling activity with daily net wins or losses for years 2015-2017. The summary was compiled from casino records subpoenaed by Amphone in January of 2019. The casino records recorded the player's activity on a particular date, the casino where she played, the amount of a marker, if issued, and amount paid on the

---

markers and redeeming them in court's findings). *See also*
https://www.thegerstenlawfirm.com/nevada-criminal-defense/2019/03/21/relying-on-casino-markers-to-gamble/.

marker, and the *net* winnings or loss on that date or session. The far-right column of the summary identified the casino source document for each line entry, and may have cross-referenced the line entry to bank account statement activity, debtor's calendar entries, photographs, and debtor's e-mail or text messages, if any. By way of illustration, Exhibit L shows that on April 28, 2017, Amphone played at the Ameristar Casino in Kansas City.[26] She had net winnings of $215,725 based upon Ameristar's player detail report at Exhibit B, page 3.[27] Exhibit L also shows that three markers totaling $180,000 were issued on April 28, 2017 in the amounts of $30,000, $50,000, and $100,000. Ameristar's marker report reflects the issuance *and payment* of those markers on April 28, 2017, indicating that Amphone used her gross winnings to pay the markers.[28] Exhibit L also cross references this line entry to Amphone's Wells Fargo account where $200,000 of her net winnings were deposited in her account on May 1, 2017.[29] This activity is consistent with Amphone's testimony that she usually paid the markers if she had sufficient winnings or deposited some or all of her winnings in her bank account for future gambling. Unfortunately, Exhibit L shows that after April 28, 2017, Amphone's "winnings" were few and far between.

Based upon Exhibit L, Amphone says she lost about $90,000 more than she won in 2015, lost $17,000 more in 2016, and incurred a disastrous $1.1 million net loss in 2017 (through October 14). In the course of those three years, Amphone

---

[26] Ex. L, p. 3.
[27] Ex. B, p. 3 shows $180,300 "Total In" and $396,025 "Total Out." The difference is the net winnings.
[28] Ex. B, p. 4.
[29] Ex. 7, p. UST259.

**13**

signed markers ranging in amounts from $5,000 to $380,000. Her casino records reference numerous sessions in which she lost $100,000 or more. As the bankruptcy schedules and claims register suggest, several casinos were left with debt exceeding $800,000.[30] While the reliability and interpretation of the casino records might be open to question in some instances, they shed some light on the frequency and degree of Amphone's gambling. The casinos appear to have welcomed Amphone's patronage and even she, while being ashamed of what gambling has done to her family, seemed proud of being a "player." She loved the action and it appears she still does. As noted above, Baha Mar and the Las Vegas and Maryland casinos made every effort to "comp" not only her attendance, but her family's, too.

Amphone's stake wasn't limited to markers. She raided her children's custodial accounts and borrowed money from relatives and friends. When she won, a small amount of the winnings were channeled into purchasing rental properties at the Sedgwick County tax sale for her father to manage, but these only account for a few thousand dollars in value. She mortgaged these properties, along with her interest in two 5-acre tracts to her friend Bich Liu to secure a loan of $120,000 that was plowed back into gambling. That loan remains unpaid. Amphone also secured gambling funds from her brother Somphang. She sold him two cars (a 2008 Corvette and a 2008 Mercedes Benz) for $77,000. She retained the cars in her possession and

---

[30] Amphone scheduled approximately $857,000 in casino claims. *See* note 48, *infra.* Proofs of claims filed by the casinos included: Claim 1-1: Desert Palace d/b/a Caesar's Palace - $361,842 (six returned markers deposited in Skyward Credit Union account); Claim 11-1: Sky Warrior Bahamas (Baha Mar Casino) - $75,000; Ameristar Kansas City - $130,000 (three markers returned NSF from Wells Fargo account from 8/21/2017 game date). Harrah's did not file a proof of claim.

14

later decided she wanted to repurchase them. In June of 2017, she paid Somphang $50,000 and another $10,000 in August. When she could not complete the transaction, he repaid the $60,000 to her.

*Tax Returns*

The quality of Amphone's disclosure of her winnings and losses to the Internal Revenue Service, the Trustee, and on her schedules was a focal point at trial. For federal income tax purposes, taxpayers report gambling income and loss by reporting winnings as "other income" on line 21 of Form 1040[31] and deducting losses on line 28 of Schedule A of itemized deductions, but only to the extent of their winnings.[32] In 2015, Amphone reported neither income nor loss though she thinks she lost over $90,000 that year and admitted she had some gambling winnings.[33] Her adjusted gross income for 2015 was $388,876.[34] In 2016, she reported $3,100 on line 21 of Form 1040 and deducted a like amount on Schedule A.[35] At trial, Amphone indicated that the $3,100 was not gambling winnings, but was a cash prize for a "hot seat" floor drawing that was in any event reportable as income. She

---

[31] Gambling winnings must be reported as gross income on federal tax return. *See* 26 U.S.C. § 61(a); *United States v. Maginnis,* 356 F.3d 1179, 1183 (9th Cir. 2004) (lottery prizes are treated as gambling winnings, which are taxed as ordinary income); *McClanahan v. United States,* 292 F.2d 630, 631-32 (5th Cir. 1961) (taxpayer had duty to report gambling winnings as gross income), *cert. denied* 368 U.S. 913 (1961).

[32] Taxpayers not in the business of gambling can only claim or deduct gambling losses as an itemized deduction on Schedule A. *See McQuarrie v. Comm'r,* 2006 WL 1157866, at *2, 91 T.C.M. (CCH) 1127 (2006) (taxpayer who was not engaged in business of gambling had to forgo standard deduction in order to take offsetting deduction for gambling losses); *Shollenberger v. Comm'r.* 2009 WL 5103973, at *2, 98 T.C.M. (CCH) 667 (2009) (casual gambler's losses are allowable, if at all, as itemized deductions in calculating taxable income therefore taxpayer who elected the standard deduction could not offset gambling losses against winnings).

[33] Ex. 12. *See* Ex. L, at p. 3 showing net gambling losses of ($90,225) for 2015.

[34] Ex. 12, p. UST490, line 37.

[35] Ex. 13, pp. UST517, UST519.

believed that she received a W-2G or receipt for the prize. She claims she lost

($17,000) that year, but could only deduct the first $3,100 of it.[36] Amphone reported

adjusted gross income of $299,996 for 2016. Her accountant Richard Morrow

testified that he assumed he'd received a "source document" evidencing the gain and

loss, possibly a Form W-2G issued by a casino.[37] Amphone amended her 2016 return

because she had married Dr. Suh and they were now eligible to file jointly.[38] The

$3,100 gambling income and loss were reported on that return, too. Her amended

2016 adjusted gross income was $256,430.[39]  In 2017, the year she lost nearly $1.1

million, Amphone reported no "other income" on line 21, nor did she report any

losses on Schedule A, despite reporting adjusted gross income of $275,846 and

admitting she had winnings in 2017.[40]

Morrow said he understood that Amphone would be amending her 2017

return, but that he hasn't been engaged to do that. He also suggested that Amphone

is likely to owe back state income taxes for her gambling winnings because Kansas

eliminated the itemized deduction for gambling losses in 2014—winnings remain

---

[36] Ex. L, at p. 3 showing net gambling losses of ($17,089) for 2016. Gambling losses are only deductible up to the amount of gambling winnings in a taxable year. *See* 26 U.S.C. § 165(d) providing that "losses from wagering transactions shall be allowed only to the extent of the gains from such transactions." *McClanahan v. United States,* 272 F.2d 663, 664 (5th Cir. 1959) (gambling losses in excess of winnings are not properly deductible for income tax purposes); *Au v. Comm'r,* 2010 WL 4537924, at *1, 100 T.C.M. (CCH) 400 (2010) (applying I.R.C. § 165(d), taxpayers who had no gambling winnings during tax year were not entitled to deduct claimed gambling losses), *aff'd* 482 F. App'x 289 (9th Cir. 2012).
[37] Morrow has been a practicing Certified Public Accountant since 1995. He described Amphone as a long-time client, first preparing her business tax returns and starting in 2015, her personal tax returns. He had no idea of the extent of Amphone's gambling until he was deposed during discovery in this case.
[38] Ex. 14.
[39] *Id.* at p. UST557.
[40] Ex. 15 and Ex. L, at p. 3 showing  2017 gambling losses of ($1,086,750).

16

income. Amphone may also owe state income taxes in the other states where she gambled. For her part, Amphone says that she didn't understand that gambling winnings are taxable income, despite the presence of a specific question about gambling winnings and losses (and Form W-2G) in Morrow's tax preparation questionnaire submitted to her with the annual engagement letter.[41] Her testimony on this point strains credibility because she actually reported the meager cash prize as gambling income on her 2016 return.[42] The "Instructions to Winner" on Form W-2G, which Amphone believed she received for the cash prize drawing, states: "Generally, report all gambling winnings on the 'Other income' line of Schedule 1 (Form 1040 or 1040-SR)."[43] In short, the gambling activity disclosed on Amphone's tax returns is nothing like the prolific volume of her wins and losses during 2015-2017 as evidenced by the casino records summarized by Exhibit L.

On her initial bankruptcy schedules filed in April of 2018, Amphone disclosed the $3,100 gambling winnings for 2016 on her SFA in response to Question 5.[44] She identified net losses in 2017 in no  specified amount in response to Question 15.[45] A year later, Amphone amended her SFA on April 15, 2019, after this adversary proceeding began, reporting additional unspecified winnings and losses, but attaching "Debtor's complete gambling history," which is comprised of various

---

[41] Ex. 30, p. UST1503. The gambling question was included as an income item under the "*Checklist of Items We Will Need to Prepare Your Tax Return.*"
[42] The source document for the reported $3,100 gambling winnings was never produced at trial.
[43] *See* note 55, *infra.*
[44] Ex. 2 (Doc. 16), p. 42, Part 2.
[45] Ex. 2 (Doc. 16), p. 45, Part 6.

**17**

records subpoenaed from casinos and admitted into evidence in this proceeding.[46] That June, she amended the SFA again to disclose payments made to her brother on a $120,000 loan he took from a lender to allegedly help her pay income taxes.[47] She scheduled several casinos with sizeable unpaid markers as unsecured creditors on Schedule E/F.[48]

*Administration of the Estate*

Amphone's chapter 7 trustee, Edward J. Nazar, testified that these references to her gambling alerted him to it.[49] He stated that the business records and bank account information he received were sufficient to permit him to administer the case. Both Mr. Nazar and successor trustee Darcy Williamson have been successful in locating and marshalling assets and recoveries in this case. In addition to suing the Samini law firm and obtaining a $140,000 settlement,[50] the trustee sold some of Amphone's nonexempt real property. He informally recovered $18,000 of preferential transfers Amphone made to her brother.[51] He obtained turnover of the value of Amphone's shares of Principal Financial Group stock in the amount of $6,882.[52] He settled an adversary proceeding against Healing Hands and

---

[46] Ex. 3 (Doc. 82), p. 2, Part 2, Question 5 (adding gambling winnings in 2017) and p. 5, Part 6 (adding gambling losses for 2017-2018). The attachments to amended SFA included gaming records produced in early 2019 by several casinos and were supplemented in August of 2019 with additional casino records. *See* Doc 101.The Court did not compare these attachments to the gaming records admitted at trial, relying on the latter in this Order.

[47] Ex. 4 (Doc. 92), p. 9, Part 7, Question 18.

[48] Those unpaid marker claims totaled $857,650. *See* Ex. 2 (Doc. 16), pp. 21-25, Schedule E/F, Part 2, Line 4: Ameristar Casino & Hotel - $128,000; Baha Mar Casino - $75,000; Caesars Palace - $354,500; and Harrah's - $300,150.

[49] Mr. Nazar resigned as trustee effective October 15, 2019.

[50] Doc. 123.

[51] Doc. 93.

[52] Doc. 90.

18

Amphone's business "partner" for enforcement of the LLC's Operating Agreement and Buy/Sell Agreement for $5,000.[53] He compromised a turnover motion associated with Amphone's prorated accrued and unpaid wages, non-exempt vehicles, rents on nonexempt real estate, and her interest in Healing Hands, for $25,000.[54] Importantly, Nazar testified that Amphone's not having maintained real time records of winnings and losses in no way hampered his efforts and that there was no question how she lost her assets.

Only Amphone and Morrow testified about what records non-professional gamblers typically keep. Amphone stated that many of her fellow gamblers rely on the casinos to keep track of wins and losses, particularly when marker play is involved. Casinos can identify who is playing because higher stakes players have "players club" cards that they use to purchase or redeem chips or request credit. She said that she relied on the casinos, though I doubt Amphone was focused on maintaining accurate financial records of her activities during her months-long spree. She also said she relied on her bank statements, though that is inconsistent with her testimony that she didn't get physical statements, didn't balance her accounts, and only accessed her accounts online from time to time.

Morrow said he had never prepared a return for a professional gambler or a person engaged in the business of gambling, but that some number of his clients gambled casually. He opined that someone who gambles for a living would need to maintain tax records like any other businessperson. He had prepared many returns

---

[53] Doc. 61 *See Nazar v. Gibbs (In re Amphone),* Adv. No. 18-5086 (Bankr. D. Kan.).
[54] Doc. 60.

for people with gambling wins and losses (mostly playing slot machines), and the typical records they maintained included their bank records and documents received from casinos including receipts and W-2G forms.[55] He noted that casual gamblers could simply perform an annual "netting" of wins and losses versus keeping records by "session" as a professional gambler would be required to do. He believed that the Internal Revenue Service would accept records provided by the casinos as support for Schedule A gambling loss deductions. Morrow has only rarely encountered a casual gambler who kept a daily diary of wins and losses.

The casino records offered in this case were obtained after this adversary proceeding started. Amphone subpoenaed them and most of the casinos responded with copies of won and lost records (player's detail reports) covered by a records custodian's certification. Each casino's form of records was slightly different, but all convey essentially similar information. For each "session"—time spent at a table or machine—the records show how much the gambler won or lost on a net basis, whether markers were issued, and in what amount. Payments to and from the gambler are also described. Because the records came in response to documents subpoenas, some had certificates of authenticity made by custodial officers. But even those records came with a caveat that stated that they were not necessarily reliable or accurate and, in some cases, were not to be shared with casino

---

[55] Morrow understood that certain levels of winnings triggered the issuance of a Form W-2G to the gambler such as winnings in excess of $5,000 or a payout that was 300 times the amount of the wager. If the winnings fell below that level, it was up to the taxpayer to self-report the winnings. If a W-2G was issued, that occurred when the gambler cashed out at the cage and the winner was required to sign the form. Amphone produced no W-2Gs. *See* Form W-2G and instructions at https://www.irs.gov/pub/irs-prior/fw2g--2020.pdf, viewed on January 17, 2020.

customers. Whether the casino records were accurate to the penny, they did enable the debtor to corroborate when and where she gambled by comparing the records with her bank statements, travel records, texts, and e-mails. Whether these records would serve to prove the casinos' claims is not as important in this matter as whether they corroborate the frequency and extent of Amphone's gambling in so many different venues.

The UST filed this complaint, asserting that the records Amphone produced was so lacking that she should be denied a discharge under § 727(a)(3). The UST also argues that Amphone has failed to "satisfactorily explain" her losses which is an additional ground for denial of discharge under § 727(a)(5). The Court received trial briefs and heard evidence over two days, November 4 and 5, 2019.

<u>Analysis</u>

If there was a discharge exception for gambling, this case would be easy— Somphien Amphone wouldn't get one. But this case isn't about her imprudent and excessive gambling, her morals, or even whether she committed a fraudulent or deceptive act. Gambling is a legal activity that many states (including Kansas) promote. The only questions in this case are whether she kept records appropriate to her circumstances and whether she has sufficiently explained her losses. If she failed in either endeavor, the UST wins, and she loses her discharge.

*Section 727(a)(3) Failure to Maintain Records*:

Section 727(a)(3) provides that debtor may not receive a discharge if —

the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents,

records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified *under all of the circumstances of the case*;[56]

In § 727(a)(3) actions, the plaintiff must make a prima facie case that the debtor has failed to maintain records. If that case is made, the burden of persuasion shifts to the debtor to justify her failure to maintain records "under all the circumstances." This provision has been applied differently to debtors depending on their status and sophistication. A sophisticated businessperson might be required to have scrupulous records of profit and loss in her business while an ordinary consumer might not have kept any but the most rudimentary records. A debtor's failure to maintain records must "be justified under all of the circumstances."

The Tenth Circuit Court of Appeals interpreted this subsection in *Gullickson v. Brown*[57] where a creditor claimed that a debtor who hadn't kept records concerning his car collection should be denied a discharge. The district court reversed the bankruptcy court's denial of debtor's discharge, finding uncontroverted that collecting cars was just the debtor's hobby, not a business, and that cash transactions among car collectors were commonplace. Thus, the debtor's failure to keep records of those transactions was justified. The Circuit Court affirmed the district court, noting that the creditor "had to demonstrate that [debtor] had failed to maintain and preserve adequate records and that the failure made it *impossible* to ascertain his financial condition and *material*

---

[56] 11 U.S.C. § 727(a)(3). Emphasis added.
[57] 108 F.3d 1290 (10th Cir. 1997).

22

business transactions."[58] The "impossibility" standard, and the reference to "material business transactions," sets a high bar for creditors and trustees in the Tenth Circuit in making a § 727(a)(3) case.

The Tenth Circuit Bankruptcy Appellate Panel (BAP) has addressed this subsection in at least two opinions, *In re Stewart*[59] and *In re Sears*.[60] Both deserve study. The *Stewart* debtors were a commercial realtor and his wife. Stewart ran a sole proprietorship real estate brokerage and was a real estate investor in two buildings, one as a sole proprietor and the other as a joint venture. When a creditor objected to the debtors' discharge on the records exception, Stewart produced documents and records at trial including bank statements and recent income tax returns. When his solely-owned building's tenant abandoned the premises about two years pre-bankruptcy, Stewart stopped keeping records because the property wasn't generating a profit and wasn't occupied. During the chapter 7 case, its mortgagee obtained stay relief to foreclose and the chapter 7 trustee abandoned it. In those circumstances, the bankruptcy court found the failure to keep records justified. The BAP agreed, quoting *Brown*'s language that to make a records lapse actionable, it had to make it impossible to ascertain a debtor's financial condition or material business transactions. The panel stated, "the records that were produced

---

[58] *Id.* at 1295 (citing *In re Folger*, 149 B.R. 183, 188 (D. Kan. 1992) (emphasis in the original)).
[59] *The Cadle Co. v. Stewart (In re Stewart)*, 263 B.R. 608 (10th Cir. BAP 2001).
[60] *Martinez v. Sears (In re Sears)*, 565 B.R. 184 (10th Cir. BAP 2017).

23

sufficiently identified transactions to allow [creditor] and the Chapter 7 trustee to make an intelligent inquiry about Stewart Properties."[61]

The BAP dispatched the creditor's arguments concerning the joint venture similarly, noting that the debtor had requested records from his fellow joint adventurer who ran the business and that the associate failed to supply them. The objecting creditor had not requested the records at all. The debtor's failure to provide records was justified in those circumstances.[62] Finally, as to the brokerage, Stewart didn't provide records until trial. Each party produced a post-trial reconciliation. Even though the reconciliations did not reach the same conclusions, the bankruptcy court ruled that the documents produced led to a review of the debtors' individual affairs that accounted for nearly all of their assets and expenditures, and determining the creditor's records complaint to be without merit.[63] The BAP affirmed the judgment denying the creditor's § 727(a)(3) complaint.

In *Sears*, the debtor, uneducated beyond the seventh grade, operated several cattle concerns. Before bankruptcy, he and his family drew over $2.0 million in cash from the businesses, spending the money with virtually no explanation. With the help of an accountant, the debtor offered reconstructed financial reports based upon information he provided that the bankruptcy court found wanting. Affirming the denial of discharge under § 727(a)(3), the BAP held that the scope of a debtor's duty

---

[61] *Stewart,* 263 B.R. 608, 615 (noting that the trustee abandoned the estate's interest in the building based upon the documents that were provided).
[62] *Id.* at 616.
[63] *Id.*

to maintain records depends on the nature of the debtor's business and the facts of each case.[64] The more sophisticated the debtor, the higher the expected quality of the records. The debtor's reconciliation was incomplete and inaccurate, commingled personal and business expenses, and the debtor could not explain anything about how he and his family disposed of the cash draws beyond saying "we spent it." Not even the debtor's limited education inoculated him from this result. There was no evidence that a reasonable person in similar circumstances in the debtor's business would conduct himself this way. Nor was it shown that drawing but not accounting for cash in the cattle business is commonplace. The BAP affirmed the bankruptcy court's denial of Sears' discharge concluding that his record-keeping failure was not justified.[65]

Records-exception cases involving gambling are particularly fact-driven. Courts often distinguish between casual gamblers and those who gamble for a living. In *In re Tauber*, the debtor was an experienced businessperson who did not account for a $35,000 shareholder loan that he took from the business to gamble.[66] Rejecting a § 727(a)(3) objection to discharge, the Court stated that though the debtor ran a business, the gambling was unrelated. The case was a consumer case. The *Tauber* court concluded: "In this context, the Court will not adopt a record keeping standard for all of the consumer debtor gamblers who pass through its portals that requires them to document each gambling adventure in terms of a

---

[64] *Sears,* 565 B.R. 184, 189-90.
[65] *Id.* at 191.
[66] *Buckeye Retirement Prop. v. Tauber (In re Tauber),* 349 B.R. 540 (Bankr. N.D. Ind. 2006).

25

[daily] record of winnings and losses . . . ."[67] Similar cases consider the debtor's education, sophistication, the size and complexity of a debtor's business, the debtor's personal financial structure, and any special circumstances.[68]

Contrast this with *In re Tran*, where a machine operator who purchased luxury merchandise with credit cards, then sold it to raise a gambling stake, and then filed for bankruptcy was held to a higher record-keeping standard because, as the court explained, he "engaged in atypical transactions."[69] Tran played poker against other casino patrons, not the casino, and the casino did not maintain win-loss records for him. His failure to maintain his own win-loss records was grounds for denying his discharge because the evidence "does not establish the typicality of [debtor's] records when compared against other gamblers."[70] The Court was unsatisfied with the debtor's after-the-fact outline of asset dispositions, credit card statements, and bank statements. Nor did it find the debtor credible.

Some courts hold that providing extensive bank account records and other records of income and expense can save a debtor from the records exception. In *In re Huynh*, the Court considered varieties of gambling records that are acceptable by the Internal Revenue Service.[71] Diaries of activity as well as wagering tickets, cancelled checks, credit records, bank withdrawals, and statements of actual winnings or payment slips provided by the casino could suffice.[72] But Huynh failed

---

[67] 349 B.R. 540, 556.
[68] *Kaler v. Huynh (In re Huynh)*, 392 B.R. 802, 812 (Bankr. D.N.D. 2008).
[69] *United States Trustee v. Tran (In re Tran),* 464 B.R. 885, 893 (Bankr. S.D. Cal. 2012).
[70] *Id.* at 894.
[71] *Fokkena v. Huynh (In re Huynh),* 379 B.R. 865, 874 (Bankr. D. Minn. 2008).
[72] *Id.*

26

to supply any of these sorts of records concerning her gambling, though she did produce records about the rest of her financial affairs.

In the Tenth Circuit, an actionable failure to maintain and preserve records under § 727(a)(3) must render ascertaining a debtor's financial condition or material business transactions impossible. If the records provided are sufficient to allow the trustee or creditor to examine the transactions, the discharge exception fails. If the debtor's records are like those of other similarly situated debtors or if the debtor's record-keeping practices are commonplace, the exception is unlikely to be enforced. While *Brown*, *Stewart*, and *Sears* didn't involve gambling, these principles apply to this case. The cases from other jurisdictions suggest how subjective and fact-driven records-exception cases can be.

This is a consumer case. No claim is made, and no evidence was presented, that Amphone commingled her Healing Hands and personal financial affairs. Unlike *Sears,* there was no evidence that Amphone took draws from Healing Hands to gamble. Amphone maintained personal bank accounts separate from her husband. No evidence at trial suggests that Amphone diverted funds to or from her husband's accounts. Apart from the relatively small acquisition of real estate at the tax foreclosure sale, there was no evidence of large asset purchases with gambling proceeds. So what records did Amphone produce to the UST in discovery and at trial? She produced: (1) casino records, including daily activity reports and credit or marker documents, from nine casinos;[73] (2) bank account statements from three

---

[73] Ex. A-I.

Case 18-05083   Doc# 162   Filed 02/24/20   Page 27 of 36

main accounts: Wells Fargo, Skyward, and Meritrust;[74] (3) 2015-2017 tax returns;[75] (4) calendars;[76] (5) photographs from gambling trips or "comps";[77] (6) e-mails and texts with casino personnel;[78] and (7) Samini law firm retainer transaction documents.[79]

What records did Amphone fail to maintain or preserve? We have Amphone's admission that she destroyed receipts for markers to hide her gambling addiction from her husband. She did not maintain or preserve any of her Emprise Bank account statements. This omission is particularly troubling in that the Emprise accounts were not closed until "Aug/Sept 2017," just a month or two before the end of her gambling binge in mid-October.[80] We know from her testimony and other account statements that some funds were withdrawn or transferred from the Emprise accounts for gambling. Without the Emprise records, the Court cannot be certain that the complete picture has been presented. She claims she no longer had online access once the accounts were closed. But unlike the casino records, she apparently made no effort to subpoena the Emprise account statements. But, considered in context with all the other records provided, this records omission is

---

[74] Ex. 7-9.
[75] Ex. 12-15.
[76] Ex. 21.
[77] Ex. 20.
[78] Ex. 22-26.
[79] Ex. 28-29.
[80] In other words, the Emprise accounts encompass nine of the fifteen-month period for which she produced the other bank account statements. And as Exhibit L demonstrates, Amphone was at the height (or depth) of her gambling activity in the first ten months of 2017.

not material.[81] Nor is Amphone's failure to maintain credit card statements for cards she used to obtain an estimated $7,000 in cash advances to gamble.

Applying Tenth Circuit § 727(a)(3) case law and out-of-circuit gambling case law, did Amphone's documentation make it "impossible" to examine her gambling transactions? No. Though it is a tedious process to review the casino records with the bank account statements, that process tells us a lot about where her gambling winnings and losses went during the 2015-2017 binge. None of the money seems to have come from or gone into her business. Amphone is more like the businessman debtor in *Tauber* whose gambling was unrelated to his business. That court deemed his case a consumer case and held him to a lower records standard. Amphone's documents are substantially better than those in the *Sears* case. Unlike the debtors in *Huynh* and *Tran*, she is able to provide some factual background about her gambling activities. Like *Stewart*, she has records that could likely be reconciled by an accountant or bookkeeper. Trustee Nazar, who has over four decades' experience as a trustee in this Court, said Amphone's records did not impede his administration in any way. As accountant Morrow testified, there is no legal basis for demanding that a non-professional gambler maintain a daily diary; rather, as the *Huynh* court points out, that is merely one way of documenting deductible gambling losses. Even if Amphone had diaries, she would still need corroborating documents like bank statements and casino records to support them. She supplied

---

[81] *See Cadlerock Joint Venture, L.P. v. Sauntry (In re Sauntry),* 390 B.R. 848, 855-56 (Bankr. E.D. Tex. 2008) (noting that the materiality of the records insufficiency should be considered, quoting *In re Benningfield,* 109 B.R. 291, 293 (Bankr. S.D. Ohio 1989)).

**29**

both of those.[82] And, as the *Sears* court pointed out, there was no evidence crediting or discrediting her statement that her record-keeping was any different from that of any other non-professional gambler.

I conclude, based on Dr. Briles-Kline's severe gambling disorder diagnosis, that Amphone is an "addict." Over 34 months, she gambled in two countries and several different states for more than 300 days—more than one-third of the time. She often returned from one trip only to leave on another within 24 hours. A person that taken up with gambling might not take the time to keep the scrupulous records the UST seems to expect. Even if she kept all of her marker receipts, I am not certain what they would tell us that the casino records can't. The bottom line is that she gambled and lost a lot of money. The records admitted at trial support the extensive losses that Amphone claims, as do the schedules and proofs of claim filed by casinos.

In short, Amphone's record-keeping is more than we might expect from a consumer debtor, and certainly more than one would expect of a seriously addicted gambler. In this case, her extensive bank records and casino documents (even if they aren't entirely reliable or complete) give the Court and the creditors a fair idea of the extent of her losses and, accordingly, some representation of her financial affairs. I cannot find that her record-keeping made it impossible to ascertain her financial condition or the extent of her gambling losses.

---

[82] Section 727(a)(3) doesn't require a debtor with a gambling addiction to keep a "win/loss" diary in order to receive a discharge. *See In re Sauntry,* 390 B.R. 848, 856; *In re Tauber,* 349 B.R. 540, 557.

If Amphone's record-keeping was inadequate, her justifications for that deficiency must also be considered. Amphone proffered two justifications for failing to maintain contemporaneous gambling records. One, she believed she could access records of her gambling activity maintained by the casinos. Her subpoena of those records from the casinos establishes their availability and likely evidences her activity in more detail than any receipts she failed to preserve. Two, she sought to conceal the extent of her gambling from her disapproving husband and family. The latter justification was persuasive in *In re Sauntry*.[83] In that case, the debtor-husband had a gambling addiction and the debtor-wife credibly testified regarding inadequate records due to his active efforts to hide the scope of his gambling and her efforts to control her husband's access to their money by converting the couple to operate on a cash basis.[84] Amphone's failure to keep her own detailed, daily records of her gambling winnings and losses was justified under the circumstances.

Even if the UST had successfully convinced me that Amphone failed to maintain adequate records or that Amphone's recordkeeping failure was unjustified, I retain the discretion to grant her a discharge.[85] She should receive judgment on the § 727(a)(3) claim.

*Section 727(a)(5) Failure to Explain*:

---

[83] 390 B.R. 848 (Bankr. E.D. Tex. 2008).

[84] *Id.* at 856.

[85] Most courts conclude that the language of § 727(a) vests bankruptcy courts with discretion to grant a discharge, even when grounds exist for denial of discharge. *See e.g. In re DiGesualdo,* 463 B.R. 503, 523-25 (Bankr. D. Colo. 2011); *In re Bane,* 426 B.R. 152, 161-62 (Bankr. W.D. Pa. 2010); *In re Tauber,* 349 B.R. 540, 546 (Bankr. N.D. Ind. 2006); *In re Hacker,* 90 B.R. 994, 997-98 (Bankr. W.D. Mo. 1987). *See also Union Planters Bank, N.A. v. Connors,* 283 F.3d 896, 901 (7th Cir. 2002) (citing *Hacker*).

31

Section 727(a)(5) provides a discharge exception where—

> the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities.[86]

This sanctions a debtor who cannot satisfactorily explain a loss of assets that would meet her debts. The explanation must be made before the Court determines whether to grant a discharge. The allocation of proof under this subsection is similar to that under § 727(a)(3): the complaining party must show that there are unexplained losses, shifting the burden to the debtor to "explain satisfactorily." Amphone did not fully explain her losses initially, but her testimony, bank records, casino records, and the court docket all suggest that she spent and lost a fortune gambling.[87] The statute's use of the word "satisfactorily" leaves considerable discretion to the Court.[88]

The Tenth Circuit Court of Appeals hasn't interpreted § 727(a)(5), but in *Sears* and *Stewart*, the Tenth Circuit BAP addressed the level of proof necessary for a debtor to "explain" her losses. The *Sears* panel noted other circuits require corroboration of a debtor's explanation by either documents or witnesses while others have simply rejected "general explanations."[89] That panel easily affirmed the

---

[86] 11 U.S.C. § 727.
[87] At the close of the UST's case-in-chief, Amphone orally moved for judgment on partial findings on the UST's § 727(a)(5) claim only. The Court deferred its ruling on the motion at trial. Having now considered all of the evidence, I conclude that the UST met its prima facie burden of proof on this cause of action and the debtor's Rule 52(c) motion for partial judgment is therefore denied.
[88] *Sears,* 565 B.R. 184, 192.
[89] *Id. See Dolin v. Northern Petrochemical Co. (In re Dolin)*, 799 F.2d 251, 253 (6th Cir. 1986) (determining debtor's "general, unsubstantiated statements" regarding his cocaine addiction and compulsive gambling insufficient to overcome § 727(a)(5) objection to discharge); *Chalik v. Moorefield (In re Chalik),* 748 F.2d 616, 619 (11th Cir. 1984) (vague and indefinite explanations of losses that are uncorroborated by documentation are unsatisfactory); *Aoki v. Atto Corp. (In re Aoki)*, 323 B.R.

32

bankruptcy court's rejection of the debtor's uncorroborated explanation that he moved money among his businesses to treat shortages and that he had returned some of the owner draws to some of the businesses. The *Stewart* bankruptcy court received post-trial reconciliations of financial information provided by the debtors at trial. Differing accounting approaches resulted in the creditor's report contending that the debtor had failed to explain the loss of $22,000 while the debtor's report explained all losses. The Tenth Circuit BAP agreed that the debtor's explanation was sufficiently corroborated.

In *Tran*, the debtor's explanation of his gambling losses was, at best, meagre. Tran supplied virtually no documents, leading that court to rule that only his story could save him. It found the story to be "incomplete, questionable in many details, and certainly far short of an explanation that meets his burden . . ."[90] Tran's "story" was shorn of details and limited to saying he lost the money he raised, by selling recently-purchased merchandise, gambling.  In the *Huynh* case, the debtor who adequately explained and documented her non-gambling losses had no documented explanation of her gambling. Her only "explanation" came in the form of a gambling counsellor's affidavit that opined Huynh was a "pathological gambler."[91] The *Huynh* court concluded that the gambling explanation was not enough.

803, 817 (1st Cir. BAP 2005) (requiring corroboration of explanation and corroboration that eliminates the need to speculate what happened to the assets); *McVay v. Phouminh (In re Phouminh),* 339 B.R. 231, 248 (Bankr. D. Colo. 2005) (explanation in general terms that is merely suggestive of reasons for depleted assets "falls short of the mark," citing *Bell v. Stuerke (In re Stuerke),* 61 B.R. 623, 626 (9th Cir. BAP 1986)).
[90] 464 B.R. 885, 895 (noting that conclusory statements are not enough).
[91] 379 B.R. 865, 872-73.

In *In re Inerzo*, the court held that corroborating documentary evidence is not required in every (a)(5) case and that a debtor's explanation of his gambling losses, supported by his father's testimony, was credible and convincing.[92] In *In re Sauntry*, the court accepted personal records like checking account statements as corroborating the debtor's gambling loss explanation even though the debtor's actual gambling records were scant and overruled a §727(a)(5) objection.[93]

These cases describe a wide range of "satisfactory explanations" under § 727(a)(5). Like the *Stewart* and *Sauntry* courts, I received a lengthy set of bank statements that, read with casino records, reflect Amphone's four-, five-, and six-digit banking transactions with casinos. She also offered a compilation of each day's gambling, its location, whether markers were used, and how much was won or lost.[94] The compilation may not amount to the reconciliation the *Stewart* court received, but a lengthy set of documents were admitted at trial in support of the compilation, including casino records. Exhibit L included columns for markers issued and markers paid on her gambling excursions. The Court's own calculation of the sum of the markers Amphone paid in 2017 alone exceeds $3.5 million. This is consistent with Amphone's testimony that when she did win, she typically paid off her markers or plowed the winnings back into more gambling. Even when she lost, she paid most of her markers—at least till the mounting losses toward the final

---

[92] *Adams v. Inzero (Inzero),* 426 B.R. 428, 432-34 (Bankr. D. Conn. 2009).
[93] 390 B.R. 848, 858.
[94] Ex. L.

months made that impossible.[95] In addition, as in *Inerzo*, the debtor testified

extensively about her gambling experiences. That testimony amounts to much more

than a "story." Amphone gambled often and lost. The casinos' running accounts of

her activities, while not entirely reliable, support my conclusion that she

continuously lost money. Exhibit L reflects $1.1 million more in losses than

winnings in 2017. Some casinos barred her from returning. Some placed her on

payment plans and all menaced her with criminal law repercussions should she

default on a marker. It's true that Amphone can't account for every penny of

gambling gain and loss, but in my experience, few individual chapter 7 debtors can.

Ninety years ago, a court articulated how the "explained satisfactorily"

standard in § 14c(7), the 1898 Act's precursor of § 727(a)(5), should be applied—

> The word 'satisfactorily,' as contained in the amendment referred to,
> may mean reasonable, or it may mean that the court, after having heard
> the excuse, the explanation, has that mental attitude which finds
> contentment in saying that he believes the explanation— he believes
> what the bankrupts say with reference to the disappearance or the
> shortage. He is satisfied. He no longer wonders. He is contented.[96]

Then, as now, considerable weight was accorded to the Court's assessment of the

debtor's explanation and credibility. Amphone's explanation isn't perfect, but it is

sufficient.  Poor accountability and prior bad decisions are commonplace in

individual chapter 7 cases.  The Bankruptcy Code doesn't expressly penalize bad

decisions like binge gambling unless the debtor simply cannot explain her losses.

---

[95] The Court calculated from Ex. L, Amphone's net winnings for all of 2017.  That sum was $2.4 million, monies that this Court is convinced Amphone plowed back into gambling and lost.
[96] *In re Shapiro & Ornish*, 37 F.2d 403, 406 (N.D. Tex. 1929), *aff'd sub nom. Shapiro & Ornish v. Holliday*, 37 F.2d 407 (5th Cir. 1930).

35

Setting aside the moral and prudential implications of Amphone's high-stakes gambling, the issue is whether she has "satisfactorily" explained her losses. I am "contented" that she has. Amphone should be granted judgment on the UST's § 727(a)(5) claim.

Conclusion

In deciding whether to grant a chapter 7 discharge, "the Bankruptcy Code must be construed liberally in favor of the debtor and strictly against the creditor."[97] "The reason for denying a discharge to a bankrupt must be real and substantial, not merely technical and conjectural."[98] The Court emphasizes that the purpose of § 727(a) objections to discharge is to protect the integrity of the bankruptcy system from debtor misconduct, not "to police the debtor's legal and ethical [or moral] obligations more generally."[99] Though Somphien Amphone's record-keeping was not perfect and her compulsive gambling was dangerous and imprudent, I cannot conclude that she failed to keep records reasonable for someone in her circumstances or that she has failed to satisfactorily explain her losses. Judgment will be entered for the defendant on the UST's Complaint.

# # #

---

[97] *In re Brown*, 108 F.3d 1290, 1292 (10th Cir. 1997).

[98] *Lee v. Peeples (In re Peeples)*, No. 18-4124, 779 F. App'x 561, 567 (10th Cir. 2019), quoting *Jones v. Gertz*, 121 F.2d 782, 784 (10th Cir. 1941). *See also Korrub v. Cohn ( In re Cohn)*, 561 B.R. 476, 492 (Bankr. N.D. Ill. 2016) (stating that denial of discharge is reserved only for the worst actors); *Haupt v. Belonzi ( In re Belonzi)*, 476 B.R. 899, 904 (Bankr. W.D. Pa. 2012) ("Completely denying a debtor his discharge ... is an extreme step and should not be taken lightly.") (alteration and internal quotation marks omitted).

[99] *Berger & Assocs. V. Kran (In re Kran),* 760 F.3d 206, 211 (2nd Cir. 2014) (declining to apply "extreme penalty" of denying discharge to failings unconnected with the bankruptcy proceeding).

36